# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID JOHNPAUL SENA,

    Plaintiff,

    v.

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

No. 3:17-cv-912 (MPS)

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of plaintiff David J. Sena's application for disability insurance benefits. The appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[1] Mr. Sena now moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"). In the alternative, Mr. Sena seeks an order remanding his case for a rehearing. The Commissioner, in turn, has moved for an order affirming the decision.

Mr. Sena argues, among other things, that the Administrative Law Judge ("ALJ") erred in (1) his analysis of the criteria of the relevant medical listings; (2) his determination that Mr. Sena had the residual functional capacity ("RFC") to perform a reduced range of sedentary work; and

---

[1] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929 *et seq.* Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967 *et seq.* If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. The Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

(3) his determination that Mr. Sena could perform jobs that exist in significant numbers in the national economy. Mr. Sena was injured while serving in the Marine Corps, and the sacrifices he has made for this country are admirable. Nonetheless, my role as a district judge is limited to reviewing the decision of the ALJ to determine whether it was based on the correct legal principles and is supported by substantial evidence. Therefore, because I find no error in the ALJ's decision, I must DENY Mr. Sena's motion to reverse or remand and GRANT the Commissioner's motion to affirm.

## BACKGROUND

On February 4, 2015, Mr. Sena filed an application for Social Security Disability benefits alleging an onset of disability of December 1, 2011. (Stipulated Statement of Facts, ECF No. 25 ¶ 1.) A disability adjudicator in the Social Security Administration denied his initial request for disability benefits and thereafter denied his request for reconsideration. (*Id*.) Mr. Sena appeared at a hearing before ALJ Alexander P. Borré on March 17, 2016. (*Id*. ¶ 2.) Vocational expert ("VE") Renee Jubrey and Mr. Sena's father also testified at the hearing. (R. 45.) The ALJ issued a decision denying benefits on May 17, 2016. (*Id*.)

The ALJ found that while Mr. Sena's degenerative disc disease with left lower extremity radiculopathy, headaches, and affective disorder were severe impairments, Mr. Sena did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 25-26.) The ALJ found that Mr. Sena had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that he could not climb ladders, ropes, or scaffolds; could frequently balance; and could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (R. 29.) The ALJ further found that Mr. Sena was limited to simple and repetitive tasks in an environment with no public

contact, and only occasional contact with coworkers and supervisors. (*Id*.) Based on this RFC and the testimony of a vocational expert, the ALJ concluded that while Mr. Sena was unable to perform any past relevant work, other work existed in significant numbers in the national economy that he could perform. (R. 36.)

Mr. Sena requested review of the ALJ's decision by the Appeals Council, which denied review on April 5, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*.) This appeal followed. Specific facts and portions of the ALJ's decision will be discussed below as necessary.

## STANDARD

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1).  To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.

The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. 20 C.F.R. § 416.920(a)(4). If the claimant has one of these enumerated impairments, the Commissioner will automatically consider that claimant disabled, without considering vocational factors such as age, education, and work experience. *Id.* (4) If the

impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work the claimant could perform. *Id.* To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of proof on the fifth step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4).

"A district court reviewing a final ... decision pursuant to … 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, a district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is limited to ascertaining whether the correct legal principles were applied in reaching the decision and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If the Commissioner's decision is supported by substantial evidence, I must sustain it, even where there is also substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). The Second Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citation and quotation marks omitted). Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record." *Id.*

<u>**DISCUSSION**</u>

**I.    Step Three Analysis – Medical Listings**

Mr. Sena first argues that the ALJ failed to analyze the "fit" between the specific requirements of the relevant medical listings and the evidence of Mr. Sena's conditions at step three of the analysis. Mr. Sena also argues that the ALJ's step three analysis was not supported by substantial evidence because the ALJ made no attempt to ascertain whether Mr. Sena's condition was of equal severity to other listed impairments.

The claimant bears the burden of establishing that he "meet[s] *all* of the specified medical criteria" of a medical listing at step three. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). *See also Otts v. Comm'r of Soc. Sec.*, 249 Fed. Appx. 887, 888-89 (2d Cir. 2007) (finding that the claimant did not carry her burden to demonstrate that she met all of the definitional criteria of a particular disorder).

The ALJ considered whether Mr. Sena had an impairment or a combination of impairments that met or medically equaled the severity of the conditions under the musculoskeletal listings, neurological listings, and mental impairment listings, with particular focus on Listings 1.04 (disorders of the spine),[2] 11.03 (epilepsy),[3] 12.04 (affective disorders),[4] and 12.07 (somatoform disorders).[5]

---

[2] Listing 1.04 describes "[d]isorders of the spine" such as "degenerative disc disease," "resulting in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. § 1.04.

[3] Listing 11.03 describes epilepsy "documented by detailed description of a typical seizure pattern" and "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." *Id*. § 11.03.

[4] Listing 12.04 describes affective disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Id*. § 12.04.

[5] Listing 12.07 describes somatoform disorders characterized by "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." *Id*. § 12.07.

**A. Listing 1.04 – Degenerative Disc Disease**

The ALJ found that Mr. Sena's degenerative disc disease did not meet the criteria of Listing 1.04 because the record did not demonstrate compromise of a nerve root or the spinal cord. Rather, the ALJ found that the record reflected disc bulge with mild to moderate foraminal stenosis, which did not meet the requirements of the listing. (R. 27.) In support of this conclusion, the ALJ cited the results of an MRI of Mr. Sena's lumbar spine conducted on February 6, 2013, which described "mild to moderate left neural foramen narrowing" and "minimal disc bulge" causing "mild narrowing along the right neural foramen." (R. 367.) The interpreting radiologist summarized his impression of the MRI as "[i]nterval minimal progression of disease process with new degenerative disc disease at L4-L5 and slight interval progression at L5-S1 level . . . ." (*Id*.) The ALJ also cited a September 30, 2014 report describing the results of another MRI of Mr. Sena's lumbar spine. (R. 955.) The report indicated that the MRI showed disc degeneration with disc bulge and mild central and mild to moderate foraminal stenosis. (*Id*.) These reports support the conclusion of the ALJ, as both reflected mild to moderate impairments only and neither suggested that Mr. Sena met any of the additional criteria of Listing 1.04. Mr. Sena points to no other records that reflect compromise of the nerve root or spinal cord or the additional criteria of the listing. He therefore fails to meet his burden to demonstrate that he meets the criteria of Listing 1.04.

**B. Listing 11.03 – Seizures**

The ALJ also found that the severity of Mr. Sena's headaches did not meet the criteria of Listing 11.03. Specifically, the ALJ found that, despite the fact that Mr. Sena suffered from a seizure in August 2013, he did not demonstrate a "typical seizure pattern," as his headaches had improved over time, did not involve any loss of consciousness, lasted approximately five to ten minutes each, and did not significantly interfere with his activities during the day. (R. 27.) The

ALJ cited a November 1, 2013 progress note by neurologists Drs. Kristen Rake and Hamada Hamid, which described Mr. Sena's past medical history of a seizure episode in August 2013 and subsequent headaches. (R. 418-20.) The progress note stated that Mr. Sena's experience with a single seizure was "thought to be in the context of Tramadol use" and "illicit drug use," but that Mr. Sena had been "seizure[-]free since." (R. 420.) The note further stated that Mr. Sena had headaches daily, beginning after his seizure and the head trauma he experienced as a result of falling during the seizure, but that he had been "finding good relief with [N]aproxen," and that his headaches were "overall getting better." (R. 418.)

Notes from treatment providers at the Department of Veterans' Affairs ("VA") medical clinic, where Mr. Sena received much of his treatment, also summarized Mr. Sena's diagnosis of a seizure disorder, describing the seizure he experienced on August 14, 2013 and his subsequent headaches. (613-19.) The notes were consistent with Dr. Rake's and Dr. Hamid's November 1, 2013 note, in that they suggested that the seizure might have been linked to Mr. Sena's use of Tramadol at the maximum recommended dosage (R. 619), and that Mr. Sena had not had a seizure since that occasion. (R. 616, 619.) The notes also stated that Mr. Sena had two normal head CT scans and a normal electroencephalogram ("EEG"). (R. 619.)

The ALJ also cited a May 7, 2014 progress note that stated that Mr. Sena reported improvement in his headaches, as his headaches used to occur daily but now were brief, lasting five to ten minutes only, following changes in medication and diet. (R. 635.) The note also stated that Mr. Sena denied having any "generalized seizures or frequent blank stares." (R. 636.) These records support the ALJ's conclusion that Mr. Sena did not meet the criteria of Listing 11.03, which required, among other criteria, seizures "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. § 11.03.

Mr. Sena fails to point to any records that support the conclusion that he met that requirement. He therefore fails to meet his burden to establish that he meets Listing 11.03.

### C. Listings 12.04 and 12.07 – Affective and Somatoform Disorders

The ALJ also found that Mr. Sena did not meet the criteria of the mental impairment listings 12.04 and 12.07, as Mr. Sena exhibited mild restrictions in activities of daily living, moderate difficulties in social functioning and concentration, persistence, or pace, and no episodes of decompensation. (R. 27-28.) Specifically, the ALJ found that Mr. Sena had experienced no episodes of decompensation of extended duration and that, although Mr. Sena was assisted by friends and family, he was "generally able to perform his activities of daily living independently." (R. 27-28.) The ALJ cited a VA medical note stating that Mr. Sena had mild or moderate functional impairments as a result of his subjective complaints. (R. 613.) The ALJ also cited a VA progress note that stated that on a typical day, Mr. Sena would drop off his four-and-a-half-year-old son at school, bring coffee to his brother, go to his friend's gym to exercise, and complete chores around the house. (R. 820.) The note stated that Mr. Sena still did yard work and exercised despite having pain. (*Id*.) It also stated that Mr. Sena would go out with his brother less often than he used to due to lack of motivation, pain, and limited finances. (*Id*.) The ALJ also relied on April 5, 2013 and July 22, 2013 progress notes by clinical psychologist Dr. Kelly Grover, who noted that Mr. Sena found activities he could complete, such as swimming and going to the gym (the latter of which he did three to four times per week); typically played with his son and completed chores during the day, though he might "be in tears if he push[ed] himself" to complete a task, such as shoveling snow for a long period of time; worked on keeping himself busy with "house projects, helping out family with social gatherings with cooking and setting up their patios" to "improve his mood and

his chronic pain." (R. 404, 798.) Other notes also reflected the fact that Mr. Sena swam and exercised despite experiencing pain. (R. 397.)

These records support the ALJ's conclusion that Mr. Sena's mental impairments created, at most, moderate restrictions on his daily activities. And while Mr. Sena generally argues that his mental impairments were severe, he does not point to any objective evidence demonstrating that he met the specific requirements of either Listing 12.04 or 12.07.

Notes reflecting that Mr. Sena was working some amount also demonstrate that he did not meet the criteria of Listings 12.04 or 12.07. A January 30, 2013 physical therapy treatment note reflected that Mr. Sena was "working as a mechanic and finding it difficult lately to do his job due to" lower back pain. (R. 410.) A July 2, 2013 behavioral pain progress note stated that he was spending five to six hours, two to three days per week at his former job, "helping to manage customers and solve problems." (R. 716.)

The ALJ noted with regard to Mr. Sena's social functioning that Mr. Sena testified that he became frustrated and had a difficult time getting along with others due to his back pain, as well as his mother's statement that Mr. Sena had become "distracted and irritable" due to back pain. (R. 322.) The ALJ also cited progress notes documenting that Mr. Sena had reported to his treatment providers that he experienced poor stress tolerance and that he had difficulty communicating with his wife. (R. 1269, 1274.) The ALJ also cited evidence, however, that Mr. Sena's mental health providers found him to have "good insight into the relationships among stress, depression, sleep, and pain," that Mr. Sena was "coping relatively well with his pain," was "continuing to remain physically active," "ha[d] good social support," and was learning pain-management skills from his psychologist. (R. 821.) These records further support the conclusion

that the ALJ's findings with regard to Listings 12.04 and 12.07 were supported by substantial evidence, and Mr. Sena points to no evidence that the ALJ overlooked.

Mr. Sena does not point to any other listed impairment that he claims his condition met or medically equaled. His claim that the ALJ "ma[de] no attempt whatsoever to ascertain whether Mr. Sena's condition is of equal severity to a Listed impairment" therefore fails. Mr. Sena relies primarily on the ruling in *Howarth v. Berryhill*, in which the district court found that the ALJ "failed to articulate any reasons at all for his finding that paragraph C criteria [of Listing 12.04] had not been satisfied." No. 16-CV-1844 (JCH), 2017 WL 6527432, at *5 (D. Conn. Dec. 19, 2017). Here, by contrast, the ALJ clearly stated his reasons for finding that Mr. Sena did not meet the criteria of each relevant medical listing. (R. 27-28.) Mr. Sena has not met his burden to demonstrate that the ALJ erred at step three.

## II.   RFC Determination

Mr. Sena also challenges the ALJ's determination that Mr. Sena had the RFC to perform a reduced range of sedentary work. Mr. Sena raises four challenges to the RFC determination: 1) that the ALJ failed to appropriately weigh a determination by the VA that Mr. Sena was disabled; 2) that the ALJ failed to appropriately weigh the treating source opinion of APRN Joanne Gardner; 3) that the ALJ "cherry-picked" the evidence, focusing on evidence unfavorable to Mr. Sena, to the exclusion of favorable evidence; and 4) that the ALJ failed to properly evaluate Mr. Sena's subjective complaints of pain. I address each of these arguments below.

The RFC "is the most [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ assesses a claimant's RFC based on "all the relevant evidence" in the record, including "all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including . . . medically determinable impairments that are not 'severe'. . . ." *Id.* §

404.1545(a)(2). The ALJ must "consider any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," and must consider "descriptions and observations" of the claimant's limitations, including limitations resulting from symptoms such as pain. *Id*. § 404.1545(a)(3).

### A. VA Determination

Mr. Sena first argues that the ALJ erred by failing to appropriately weigh the VA's February 4, 2014 determination that Mr. Sena was "individually unemployable" as a result of a disability, for the purpose of receiving veterans' benefits. (R. 249-55.) The VA adjudicator determined, after a review of evidence and Mr. Sena's testimony at a hearing, that Mr. Sena had a combined 80% service-connected disability, and that he was individually unemployable as of March 2, 2013, the day after he last worked. (R. 251-52.) Specifically, the VA determined that his L5-S1 disc bulge was 60 percent disabling, his major depressive disorder was 50 percent disabling, his left leg radiculopathy was 20 percent disabling, his right leg radiculopathy was 10 percent disabling, his tinnitus was 10 percent disabling, and his status post-inguinal hernia operation, including a residual surgical scar, was 10 percent disabling. (R. 252.) The VA adjudicator disagreed with the opinion of a VA examiner that Mr. Sena would be able to perform sedentary labor despite his back and leg conditions, finding instead that Mr. Sena was "precluded from engaging in all forms of substantially gainful employment, both physical and sedentary." (R. 253.)

Decisions of other governmental agencies are not binding on the Commissioner's disability determination. *See* 20 C.F.R. § 404.1504; SSR 06-03p. Nonetheless, the Second Circuit has held that they are "entitled to some weight and should be considered." *Rivera v. Colvin*, 592 Fed. Appx. 32, 33 (2d Cir. 2015) (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir. 1975)) (finding no error where the ALJ considered the VA's 70% disability rating regarding anxiety and 20%

disability rating for a disc herniation, but found that the VA's assessment was contradicted by other evidence in the record, including the claimant's daily activities and other medical evidence). *See also Machia v. Astrue*, 670 F. Supp. 2d 326, 336 (D. Vt. 2009) ("VA rating decisions are another item to be placed on the evidentiary scale.").[6]

Contrary to Mr. Sena's argument, the ALJ stated that he considered the VA's determination but gave it little weight, noting that a finding of disability is reserved for the Commissioner and that decisions of other agencies regarding disability are not binding, as they are not based on Social Security law. (R. 35.) The ALJ also noted that Mr. Sena's Social Security claim was based on a different onset of disability date and covered a greater period of time than did his VA claim. (R. 35.)[7] Finally, and "[m]ore significantly," the ALJ concluded that the objective evidence summarized throughout the decision demonstrated that Mr. Sena had the RFC that the ALJ identified. (R. 35.) Thus, the ALJ gave specific reasons for not affording the VA determination more weight. *See Frost v. Colvin*, No. 1:14-CV-00965 (MAT), 2017 WL 2618099, at *3 (W.D.N.Y. June 16, 2017) (finding no error where the ALJ noted that it considered the VA's disability assessment but explained its reasoning for not giving it more weight).

---

[6] Mr. Sena relies on *Bird v. Commissioner of Soc. Sec. Admin.*, 699 F.3d 337, 343 (4th Cir. 2012), in which the Fourth Circuit held that "the SSA must give substantial weight to a VA disability rating." But Mr. Sena cites no case suggesting that the Second Circuit has adopted such an approach, and no court in the Second Circuit appears to have applied the standard adopted in *Bird*.
[7] Mr. Sena correctly points out that the time period covered by his VA claim is "simply unknown." (ECF No. 22-2 at 2.) The ALJ therefore may have erred in noting that Mr. Sena's "Social Security claim retains a different onset of disability and . . . covers a greater period of time than the claimant's Department of Veterans Affairs claim." (R. 35.) Nonetheless, it is unclear how this helps Mr. Sena's claim, as the lack of clarity regarding the time frame covered by the VA's determination supports the ALJ's decision not to rely on that determination. Further, any error by the ALJ in assessing the time frame covered by the VA determination is harmless, as the ALJ concluded that "the totality of the . . . objective medical evidence" supported the ALJ's RFC determination, rather than the different determination reached by the VA. (*Id.*) As discussed throughout this ruling, the ALJ's conclusion is supported by substantial evidence.

The ALJ's decision to decline to give the VA determination great weight is supported by substantial evidence, especially in light of the VA's determination that Mr. Sena was unemployable only as of March 2, 2013—over a year after Mr. Sena's alleged disability onset date—and, as discussed further below, because of the objective evidence supporting the ALJ's RFC determination. I find no error in the ALJ's treatment of the VA's disability determination as one piece of evidence used to determine Mr. Sena's RFC.

### B. APRN Gardner's Opinion

Mr. Sena also argues that the ALJ erred in giving only "partial weight" to APRN Joanne Gardner's statements, by finding that her opinions were "consistent with the record as a whole," except for her assessment that Mr. Sena would be off-task at work at least 20 percent of the time.[8]

APRN Gardner is not considered an "acceptable medical source," 20 C.F.R. § 404.1513(a), but is considered an "other source" from which evidence may show the severity of a claimant's impairments. *Id*. § 404.1513(d)(1). The ALJ therefore need only have given her opinion "some consideration," rather than controlling weight. *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008). *See also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (noting that the opinion of a nurse practitioner who treated the claimant on a regular basis was entitled to "some extra consideration").

The ALJ noted that APRN Gardner had opined in a mental residual functional capacity assessment that Mr. Sena was physically unable to perform his past work, but that he was able to understand, remember, and carry out very short and simple instructions and had a moderate limitation when it came to tolerating stress. (R. 34.) The ALJ also noted APRN Gardner's assessment of a Global Assessment of Functioning ("GAF") score of 55. (*Id*.) The ALJ explained

---

[8] Mr. Sena raises no other challenges to the ALJ's treatment of medical opinion evidence.

that he gave this opinion partial weight because, while APRN Gardner was not an "acceptable medical source," she was Mr. Sena's treating mental health provider. (*Id.*) The ALJ also found that APRN Gardner's opinion was consistent with the record as a whole, as the objective medical evidence demonstrated that Mr. Sena exhibited decreased concentration and attention but intact memory and judgment. (R 35.) The ALJ highlighted evidence that Mr. Sena demonstrated difficulty tolerating stress and reported depressive symptoms as a result of his back pain on the one hand, but noted evidence that Mr. Sena had "good insight into the relationships among his stress, depression, sleep, and pain," (*Id.* (citing R. 821, psychologist Dr. Dorflinger's progress note).) Finally, the ALJ noted that because APRN Gardner provided mental health treatment, he found her opinion on Mr. Sena's physical evidence less persuasive than the opinions of other treating sources. (*Id.*)

Mr. Sena takes issue with the ALJ's decision not to rely on APRN Gardner's opinion that Mr. Sena's impairments would substantially interfere with his ability to work on a regular and sustained basis at least 20% of the time. (R. 1267.) But APRN Gardner herself declined to answer certain questions in the assessment regarding Mr. Sena's ability to perform in a work setting, noting, "cannot evaluate work efforts in office setting." (R. 1266.) Further, although the ALJ did not specifically comment on APRN Gardner's opinion regarding interference 20% of the time, it is apparent that he found that opinion to be contradicted by other evidence in the record. (*See* R. 35 ("[T]he record demonstrates that the claimant had good insight into the relationship among stress, his depression, sleep, and pain."); *see also id.* (giving "little weight" to APRN Nicholson's opinion that Mr. Sena would be unable to function at least 20% of the day because, although his back pain contributed to his depression, "he . . . presents with a linear and goal directed thought

process, intact judgment, and intact memory" and "is able to participate in the care of his children and in some household chores up to his physical limitations") (citing R. 1009, 1014, and 1257).)

The ALJ's decision to give partial weight to APRN Gardner's opinion was not error, as "[a]n ALJ may accept parts of a [provider]'s opinion and reject others." *Camille v. Colvin*, 652 Fed. Appx. 25, 29 n.5 (2d Cir. 2016). The ALJ properly explained the reasons for giving partial weight to the opinion. I therefore find that the ALJ's treatment of APRN Gardner's opinion was supported by substantial evidence.

### C. Evaluation of Subjective Complaints of Pain

Mr. Sena further argues that the ALJ erred by discounting his subjective complaints of pain. In determining whether a claimant is disabled, the ALJ must consider the claimant's statements about his symptoms, including pain. *See* 20 C.F.R. § 404.1529(a)(1) ("We will consider all of your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability work.").

"The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(b)).

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . , but is not required to accept the claimant's subjective

complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier*, 606 F.3d at 49 (internal citations omitted); *see also Pietrunti v. Dir., Office of Workers' Comp. Progs.*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("As a fact-finder, the ALJ has discretion to evaluate the credibility of a claimant. . . .").

On March 16, 2016, two months before the ALJ issued its decision in this case (and one day before the hearing), the SSA issued SSR 16-3p, which provided updated guidance on evaluating a claimant's statements about his or her symptoms. Specifically, the SSA "eliminat[ed] the use of the term 'credibility' from [its] sub-regulatory policy," acknowledging that its "regulations do not use this term." SSR 16-3P, Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 (Mar. 16, 2016); *see also Ferreira v. Berryhill*, No. 16 Civ. 6772 (RA) (AJP), 2017 WL 2398705, at *8 (S.D.N.Y. June 2, 2017), report and recommendation adopted, 2017 WL 4949842 (Oct. 27, 2017) (applying the standard discussed in SSR 16-3p). The SSA instructed its "adjudicators to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." SSR 16-3P.

Mr. Sena does not appear to dispute that the ALJ considered his subjective complaints of pain. (ECF No. 22-2 at 20 (quoting the ALJ's discussion of Mr. Sena's pain).) The ALJ considered that Mr. Sena "experience[d] a significant amount of pain in his back and leg," and discussed the effect of medication on Mr. Sena's pain, as well as the effect of his pain on his functional limitations and his mental health, but found that the objective evidence was not fully consistent with allegations of disabling symptoms. (R. 29-30.) The ALJ based this conclusion on particular

objective evidence in the record, highlighting both "abnormal" medical findings and "unremarkable" findings. (R. 30.) In doing so, the ALJ discussed several of Mr. Sena's reports of pain reflected in the medical evidence. (*See, e.g.*, R. 30-31 (referencing reports of "significant back pain," "chronic pain," and "constant head pain" in 2013 and 2014).) The ALJ also appreciated the level of pain that Mr. Sena experienced despite taking medication. (R. 29 ("even with the use of medication he experiences pain").) The ALJ also noted the findings of Dr. Shifreen, one of Mr. Sena's treating physicians at the VA, regarding the impact of Mr. Sena's pain on his mood. (R. 33.)

Mr. Sena does not point to any error in the ALJ's reasoning, but maintains that his ability to perform everyday chores despite experiencing pain does not prove he can perform regular work. But the ALJ's conclusion that Mr. Sena's subjective complaints of pain did not render him unable to work was supported by substantial evidence. The ALJ noted specific portions of the record that reflected generally normal or mild results with respect to Mr. Sena's physical and mental status examinations. (*See, e.g.*, R. 30 (citing R. 496 ("normal gait and stance") and R. 360 (noting 5/5 strength in extremities, acceptable range of motion in upper extremities "with movements carried out without pain"); R. 32 (citing R. 367 (MRI report showing a "minimal disc bulge" and "mild to moderate left neural foraminal narrowing").) The record also reflected that Mr. Sena experienced moderate pain relief with medication and a change in diet, and as a result, his mood improved somewhat. (*See, e.g.* R. 418, 420 (November 1, 2013 neurology progress note that Mr. Sena's headaches were "overall getting better," and that he was "finding good relief with Naproxen"); R. 702 (August 12, 2013 progress note reporting that Mr. Sena's "mood [had] improved and his wife and mother-in-law ha[d] commented to him that he seems to be back to his 'old self'"). *See, e.g.*, *Ferreira*, 2017 WL 2398705, at *9 (finding that the ALJ properly found the claimant's statements

concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible where the medical evidence indicated that his health overall improved after beginning medication).

Other portions of the record further support the ALJ's evaluation of Mr. Sena's complaints of pain. While none of Mr. Sena's doctors characterized him as a malingerer, progress notes from treating psychologist Dr. Dorflinger indicated that Mr. Sena experienced an "elevated magnification of pain, and a significant degree of perceived helplessness related to pain." (R. 821.) Nurse practitioner Lorraine Taylor also noted her view that Mr. Sena "may" have been "magnifying his symptoms." (R. 613.) The ALJ also noted inconsistencies in the record regarding Mr. Sena's work activity, which "suggest[ed] that the information provided by the claimant generally may not be entirely reliable." (R. 25.) For example, the record reflected that Mr. Sena suffered a seizure while he was "at work . . . standing up installing a shelf" (R. 335) and that Mr. Sena had been "working as a mechanic" in January 2013, but found it difficult due to low back pain. (R. 410.)

The ALJ also properly considered reports of Mr. Sena's daily activities, such as exercising at the gym multiple times per week, performing chores such as laundry and yard work, and caring for his children. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (holding that the ALJ properly found the claimant's testimony about his limitations was not fully credible, in part based on the claimant's daily activities, such as caring for children, cleaning, and occasional driving). (*See, e.g.*, R. 404, 820.) Further, the fact that Mr. Sena experienced pain while sitting for long periods of time did not preclude a finding that he could perform sedentary work. *See Poupore*, 566 F.3d at 306 ("the requirement that [Mr. Sena] get up and move around from time to time does not preclude his ability to perform sedentary work").

Thus, the ALJ did not err by determining that Mr. Sena's complaints of pain did not render him disabled, in light of the other evidence in the record. Mr. Sena neither points out how the ALJ failed to consider the evidence he cites nor explains how that evidence warrants overturning the ALJ's evaluation of the intensity, persistence, and limiting effects of his symptoms under the deferential governing standard. Even if substantial evidence supported the opposite conclusion from that reached by the ALJ, that would not warrant remand. *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). Mr. Sena has not met his burden of demonstrating that the ALJ's evaluation of his subjective complaints of pain was unsupported by substantial evidence.

### D. "Cherry-Picking" of the Evidence

Mr. Sena also argues that the ALJ erred by "cherry-picking" evidence from the record that supported an unfavorable decision while ignoring evidence favorable to Mr. Sena. It is well-settled that an ALJ may not "cherry-pick" evidence by "improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source." *Rodriguez v. Colvin*, No. 3:13-CV-1195 (DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016) (quoting *Dowling v. Comm'r of Soc. Sec.*, No. 5:14-CV-0786 (GTS) (ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015)). *See also Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) ("Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion.") (internal citations omitted).

Mr. Sena argues that the ALJ noted his reports that he performed chores around the house, did yard work, and went to the gym, but ignored psychologist Dr. Grover's behavioral pain consult note that Mr. Sena "may be in tears if he pushes himself" to complete certain chores or tasks, such

as shoveling snow for a long period of time (R. 404). Mr. Sena also argues that the ALJ ignored

Dr. Grover's note that Mr. Sena reported that while he goes to the gym three to four times per

week he "[t]akes care not to overdo it" while exercising," (*id.*), and psychologist Dr. Dorflinger's

note that Mr. Sena "still does yard work [and] exercises despite pain." (R. 820.)

The ALJ referred to Dr. Grover's April 5, 2013 note (R. 404) several times throughout his

decision. (*See* R. 31 (citing Dr. Grover's note that Mr. Sena "reported that the pain that he

experienced in his back and leg were having an effect on his mood," that he "reported feelings of

depression, decreased appetite, fatigue, decreased concentration, decreased self-esteem, and

trouble sleeping," and that a "mental status examination revealed that although the claimant

presented with a dysthymic and anxious mood, he was cooperative, engaged, and motivated to find

ways to improve his functioning"); R. 32 (Mr. Sena was "performing chores around the house,

doing yard work, and going to the gym"); R. 33 (Mr. Sena was "exercising, completing chores

around the house, and remained independent in his activities of daily living"); R. 35 (noting that

Mr. Sena "presented with decreased concentration and attention," "demonstrated difficulty with

his ability to tolerate stress and reported that his depressive symptoms were a result of having to

deal with the pain in his back," and again noting that his "depressive symptoms are a result of his

chronic back pain," but noting also that his "memory and judgment were intact"); R. 36 (Mr. Sena

"reported that he was going to the gym and performing chores around the house including cooking

and yard work").)

The ALJ also referred to Dr. Dorflinger's June 7, 2013 progress note (R. 820-821) several

times throughout his decision. (*See* R. 31 (citing Dr. Dorflinger's report that Mr. Sena "reported

robust activities of daily living including, dropping his son off at school, going to the gym,

spending time with his family, and performing chores around the house," and Dr. Dorflinger's

opinion that "from a psychological/behavioral perspective, he is coping relatively well with his pain" and had "good insight into the relationship among stress, depression, sleep, and pain"); R. 32 (again citing Dr. Dorflinger's note that Mr. Sena reported "performing chores around the house, doing yard work, and going to the gym"); R. 33 (same); R. 34 (citing Dr. Dorflinger's note that he was "helping care for his children, performing household chores, and taking care of his personal needs"); R. 35 (again citing Dr. Dorflinger's note that he "had good insight into the relationship among stress, his depression, sleep, and pain); R. 36 (again citing Dr. Dorflinger's note that Mr. Sena "reported that he was going to gym and performing chores around the house including cooking and yard work").)

It is true that the ALJ appears to have afforded certain aspects of Dr. Grover's and Dr. Dorflinger's progress notes great weight, citing the same few impressions by each doctor regarding Mr. Sena's ability to complete daily activities and his coping strategies for pain several times throughout his analysis of Mr. Sena's RFC. As Mr. Sena argues, the ALJ did not, when citing those aspects of Dr. Grover's note, also cite the aspects of the note that were favorable to Mr. Sena's disability claim, that Mr. Sena could be "in tears" after attempting to complete chores, or the favorable aspect of Dr. Dorflinger's note, that Mr. Sena did yard work and exercised "despite pain."

Nonetheless, any error in the ALJ's failure to do so is harmless. The sheer number of times the ALJ cited each of Dr. Grover's and Dr. Dorflinger's notes demonstrates that the ALJ certainly took them into account, even if he did not quote the aspects of the notes that were more favorable to Mr. Sena's claim. In any event, even the ALJ's treatment of these particular notes acknowledged, in substance, that Mr. Sena experienced great pain when engaging in certain physical activities, and that his pain was affecting his mental state. The ALJ's discussion of these

notes referred, throughout the decision, to the fact that "the pain [Mr. Sena] experienced" affected his mood (R. 31), the fact that Mr. Sena was "coping relatively well with his pain" (R. 31), Mr. Sena's depressive symptoms resulting from back pain (R. 35), and Mr. Sena's "chronic pain" (R. 35). And as discussed above, the ALJ appropriately considered Mr. Sena's subjective complaints of pain.

Moreover, Mr. Sena does not demonstrate how affording greater weight to the other aspects of Dr. Grover's and Dr. Dorflinger's notes regarding Mr. Sena's pain would have changed the ALJ's RFC determination. The ALJ's conclusion that Mr. Sena could perform only a reduced range of sedentary work, such as only occasionally climbing ramps and stairs, stooping, kneeling, crouching or crawling, and being limited to simple and repetitive tasks in an environment with no public contact and only occasional contact with coworkers and supervisors (R. 29), coupled with the ALJ's numerous references to Mr. Sena's pain and the effect of his pain on his mental state, demonstrates that the ALJ took into account, and gave weight to, evidence both that Mr. Sena could not perform many physical tasks as a result of pain, and that Mr. Sena's experiences with pain affected his mood and interactions with others. *See Salmini v. Comm'r of Soc. Sec.*, 371 Fed. Appx. 109, 112 (2d Cir. 2010) (remand is not required where the Court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence") (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)); *Matta v. Astrue*, 508 Fed. Appx. 53, 57 (2d Cir. 2013) (rejecting argument that the ALJ "cherry-picked" the evidence where substantial record evidence supported the ALJ's RFC determination). I find that the ALJ did not improperly "cherry-pick" the evidence, as substantial evidence supported the ALJ's RFC determination.

### E.  Development of the Record

Mr. Sena also argues that remand is necessary because "[n]o document that could be deemed a medical source statement appears in the Record from any treating physician or other 'acceptable medical source.'" (ECF No. 22-2 at 7.) Specifically, he argues that the ALJ failed to develop the administrative record by failing to obtain a medical source statement from Mr. Sena's primary care physician at the VA, Dr. Camilo Echanique, who treated Mr. Sena from January to August 2015 (R. 1002, 1300), or from other "acceptable medical sources."

The applicable Social Security regulations provide that "acceptable medical sources" include licensed physicians and psychologists. 20 C.F.R. § 404.1513(a)(1)-(2). A medical report should include "[a] statement about what [the claimant] can still do despite [his] impairment(s) based on the acceptable medical source's findings." *Id*. § 404.1513(b)(6). The regulations provide that, although the ALJ "will request a medical source statement about what [the claimant] can still do despite his impairment(s), the lack of the medical source statement will not make the report incomplete." *Id*. The regulations further provide that, in addition to evidence from acceptable medical sources, the ALJ may also use evidence from "other sources," which include medical sources that are not considered "acceptable medical sources," such as nurse practitioners and physicians' assistants. *Id*. § 404.1513(d)(1). The regulations elsewhere define "medical opinions" as, in relevant part, "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1527(a)(1). That regulation defines a "treating source" as a claimant's "own acceptable medical source who provides [him] or has provided [him], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id*. § 404.1527(a)(2).

Against the backdrop of these regulations, the Second Circuit has provided guidance on an ALJ's duty to develop the record by requesting medical opinions from treating sources. "[T]he

Commissioner has an affirmative duty to fill any clear gaps in the administrative record." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013). An ALJ has fully developed the record when it is "complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." 20 C.F.R. § 404.1513(e)(1)-(3). "[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed. Appx. 29, 33-34 (2d Cir. 2013) (finding that remand was not required because the record contained assessments of petitioner's limitations by a treating physician); *Whipple v. Astrue*, 479 Fed. Appx. 367, 370 (2d Cir. 2012) (identifying no legal error warranting remand where ALJ had "comprehensive medical notes" from treating physician, which included observations that claimant was capable of working and that his depression and anxiety were manageable with medication). "Remand for failure to develop the record is situational and depends on the circumstances of the particular case, the comprehensiveness of the administrative record, and whether an ALJ could reach an informed decision based on the record." *Holt v. Colvin*, No. 3:16-CV-01971 (VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) (internal quotation marks and alterations omitted).

The record before the ALJ contained several opinions from Mr. Sena's treatment providers, including those at the VA, which the ALJ considered in his decision. Only two opinions provided, however, were from "acceptable medical sources"—treating psychologist Dr. Anderson and treating physician Dr. Patel—although neither of these appeared on a formal medical source questionnaire (issued by the Commissioner), which breaks down functional capacity questions into specific physical tasks and exertional levels. Dr. Anderson opined that Mr. Sena exhibited "occupational and social impairment with reduced reliability and productivity" and that he had

"serious symptoms and deficits in social, work and personal functioning" as a result of his diagnosis of major depressive disorder, but indicated that Mr. Sena did not exhibit "deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood" or "[t]otal occupational and social impairment," and was "currently considered competent to continue managing his own financial affairs." R. 877, 880. The ALJ explained that he gave Dr. Anderson's opinion partial weight only, noting that the opinion "fail[ed] in specificity" and finding that it "[did] not accurately reflect [Mr. Sena's] overall functioning" as shown by "findings throughout the record that [Mr. Sena] presented with intact judgment, memory and concentration." (R. 34.)

Dr. Patel opined that Mr. Sena was "unable to . . . work as a mechanic" and "unable to maintain substantial gainful employment." (R. 498.) The ALJ explained that he found other opinions in the record more persuasive, however, as Dr. Patel's opinion was "not supported by an explanation other than the fact that [he] reviewed the claimant's MRI, which only show[ed] mild to moderate changes" and spoke to Mr. Sena's overall employability, an issue reserved to the Commissioner. (R. 33.)

Despite containing only two explicit opinions from acceptable medical sources, the record otherwise reflected the views of Mr. Sena's treating, acceptable medical sources regarding his functional limitations. *See DeLeon v. Colvin*, No. 3:15-CV-01106 (JCH), 2016 WL 3211419, at *4 (D. Conn. June 9, 2016) ("Often, [r]ecords that are deemed to be complete without a medical source statement from a treating physician contain notes that express the treating physician's views as to a claimant's residual functional capacity, i.e., the treating physicians' views can be divined from their notes, and it is only a formal statement of opinion that is missing from the [r]ecord."). For example, the ALJ considered the findings of Dr. Shifreen, a treating pain management specialist, who completed a physical examination that was "quite benign," and noted the "lack of

symptoms with the exception of prolonged standing and prolonged sitting" and that "[e]xamination of the upper extremities, including the shoulders, elbows, and wrists did reveal acceptable range of motion with movements carried out without pain." (R. 33, 501.) Dr. Shifreen elsewhere noted that Mr. Sena continued to "help[] [his] brother out at his garage," despite being unemployed. (R. 364.) On January 18, 2013, Dr. Akilesh Singh, whom Mr. Sena saw for worsening low back and left lower extremity pain, indicated that Mr. Sena appeared to be "sitting comfortably in [a] chair," and that he had a normal gait but was "unable to squat." (R. 915.)

Dr. Echanique's treatment notes also reflected mild impairments only. (*See* R. 1002-03 (noting during his initial visit that Mr. Sena had no symptoms related to his past seizure, had no headaches, neuropathic or radicular pain, but was mildly depressed); R. 1300, 1252-56 (noting that Mr. Sena felt "overwhelmed" and had "issues with his pain to his lower back," and "appear[ed] somewhat manic . . . , speaking fast and pacing in the office, [and] kneeling on the chair instead of sitting," that he had "[n]o headaches [and] [n]o vertigo or dizziness," but had "[l]ow back pain with radiation to lower extremities" despite being "able to walk well," and was "[m]ildly depressed"); R. 1279 (noting on August 24, 2015, that Mr. Sena reported pain of a level of "about 3/10" in the umbilical region when picking up objects weighing 10 pounds or less, and that his "back pain [was] stable, present").)

Notes from other acceptable medical sources give additional insight into Mr. Sena's functional limitations and support the ALJ's RFC determination. (*See, e.g.*, R. 812-13 (note from pain management physician Dr. Brahaj that Mr. Sena was "able to complete his [activities of daily living] but it takes him extra time to complete his toileting and dressing," that he could ambulate with "no limitations but with pain," and required no aid with his gait); R. 1036 (note from pain

management physician Dr. Tankha that Mr. Sena exhibited full range of motion in shoulders, hips, and knees, strength of "5/5 throughout," and normal gait).

In addition to the above documents reflecting the views of treating, acceptable medical sources, the record contained several opinions from "other medical sources"—a physician assistant, a nurse practitioner, and two advanced practice registered nurses. *See* 20 C.F.R. § 404.1513(d)-(e) (providing that the ALJ may use evidence from "other sources," including medical sources not considered "acceptable medical sources," as long as the record is "complete and detailed enough" to make the RFC determination); *Tankisi*, 521 Fed. Appx. at 34 (the record must contain "sufficient evidence from which an ALJ can assess the petitioner's [RFC]"). These opinions, several of which were from Mr. Sena's longstanding treatment providers, spoke directly to Mr. Sena's functional limitations and what he could still do despite his impairments. (*See, e.g.*, R. 633 (PA Baker's opinion that Mr. Sena's "lumbar disc bulge and right leg radiculopathy at least as likely renders him unable to do any physical labor due to constant pain radiating into legs," which was "worse with any bending/movement, making his work as a mechanic nearly impossible because of the amount of lifting, bending and maneuvering it requires," but that Mr. Sena "would be able to maintain and secure sedentary employment"); R. 613, 619 (NP Taylor's opinion that Mr. Sena's seizure disorder did not impact his ability to work, but that his headaches did, and that he had mild to moderate functional impairment as a result of his subjective complaints); R. 1333 (APRN Nicholson's opinion that Mr. Sena's "depression, anxiety, irritability, and frustration clearly impact his ability to function day to day," exhibited in part by his need to "move his body in order to remain as comfortable as possible"); R. 1264-67 (APRN Gardner's opinion that Mr. Sena exhibited mild to moderate impairments only with respect to his mental RFC, and that while Mr. Sena could not do "robust physical labor," he could do part-time labor in a position that would

accommodate his "need for frequent changes in position [and] adaptations for breaks when stressed").

The ALJ also considered two opinions from state medical and psychological consultants, Dr. Sittambalam and Dr. Leveille, who reviewed the available evidence but did not perform a consultative examination of Mr. Sena. (R. 117-28.) The ALJ ultimately found that new evidence submitted since the state agency consultants' review supported a more restrictive RFC than opined by the state consultants, referring to medical records from Dr. Echanique (R. 1252) and clinical notes from APRN Nicholson (R. 1426). (R. 34.)[9] The ALJ was permitted to rely on these opinions, which spoke to Mr. Sena's functional limitations and were overall consistent with the objective medical evidence in the record. *See Conlin ex rel. N.T.C.B. v. Colvin*, 111 F. Supp. 3d 376, 387 (W.D.N.Y. 2015) ("As qualified experts in the evaluation of medical issues in social security disability claims, State Agency physicians' opinions may constitute substantial evidence and may be relied upon if they are consistent with the record as a whole.") (internal citations omitted); *Knight v. Astrue*, 32 F. Supp. 3d 210, 221 (N.D.N.Y. 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants . . . ."). To the extent Dr. Sittambalam's opinion on Mr. Sena's functional capacity was in part not consistent with the record, any error in relying on it was harmless, as the ALJ's RFC determination was more restrictive than that of the state medical consultant.

Overall, the opinions the ALJ considered—including those of acceptable medical sources and other medical sources—span three years, dating from Dr. Anderson's in February 2013 to

---

[9] I note that the basis for the ALJ's conclusion that these particular records supported a sedentary RFC rating is unclear. Because the ALJ ultimately concluded that the records supported a more restrictive RFC than that set forth by the state agency consultants, however, and because there is other substantial evidence in the record supporting a sedentary rating, I need not consider whether the ALJ erred in making this determination.

APRN Nicholson's in February 2016, providing the ALJ with a comprehensive view of the effect of Mr. Sena's impairments on his ability to work. The ALJ explained the weight he gave to each of these opinions, providing specific reasons for his determination with respect to each opinion. (R. 33-35.) The opinions and medical observations summarized above and considered by the ALJ—set forth in two volumes (1,432 pages) of medical records—constitute a "voluminous record" from which the ALJ could determine Mr. Sena's RFC. *Tankisi*, 521 Fed. Appx. at 32. Mr. Sena does not point to any "obvious gaps" in the record, or any functional impairment that the ALJ's RFC finding appears to have discounted. Thus, although the record does not contain an opinion regarding functional capacity from Dr. Echanique, the ALJ's decision reflects that he considered Mr. Sena's complete medical history and had ample information upon which to base the RFC determination. "[R]emand solely on the ground that the ALJ failed to request [a] medical opinion[] in assessing residual functional capacity" is therefore inappropriate. *Tankisi*, 521 Fed. Appx. at 34; *see also Swiantek v. Comm'r of Soc. Sec.*, 588 Fed. Appx. 82, 84 (2d Cir. 2015) (finding remand was unwarranted where the ALJ did not procure an opinion from a treating physician, and where the ALJ's findings were based on an evaluation of a consultative psychologist, as well as the child's complete medical history and treatment notes, which themselves contained multiple psychological assessments); *Hofner v. Colvin*, No. 1:14-CV-00629 (MAT), 2016 WL 777306, at *2 (W.D.N.Y. Feb. 29, 2016) (finding remand was unwarranted where the ALJ's RFC finding restricting plaintiff to sedentary work was fully consistent with the plaintiff's medical record and the state agency consulting physician's opinion of plaintiff's functional assessment).

III.    **Vocational Analysis**

Finally, Mr. Sena challenges two aspects of the vocational analysis upon which the ALJ relied at step five: the ALJ's hypothetical question posed to the VE regarding Mr. Sena's ability to perform light or sedentary work, and the source of the VE's testimony regarding the availability of jobs in the national economy that Mr. Sena could perform.

While the claimant has the burden to establish disability at the first four steps of the Commissioner's analysis, "if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step." *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 227 (N.D.N.Y. 2015). The ALJ may elicit testimony from a vocational expert "regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations." *Id*. at 229.

The VE testified that an individual of Mr. Sena's age, education, work experience, and RFC would be able to work as a document preparer, for which there were 45,000 jobs in the national economy, and touch-up screener, with 10,000 jobs in the national economy, both of which could be performed at the sedentary exertional level. (R. 88-89.) The VE also testified that if the same hypothetical individual had to leave the work area at frequent and unpredictable intervals due to pain symptoms, was absent from work two times per month, or was expected to be off-task 20 percent or more of the workday, that individual would not be employable at any exertional level. (R. 89-90.) The ALJ found that the VE's testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"), except that the job of document preparer was no longer performed as explained in the DOT. (R. 37.) The ALJ nonetheless accepted the VE's testimony, finding

reasonable the VE's explanation that, based on her professional experience, the document preparer job was still performed at the sedentary exertional level, maintaining an SVP of 2.[10] (R. 37.)

Mr. Sena's argument that the hypothetical posed to the VE failed to properly characterize his RFC is premised on his argument that the RFC determination was erroneous. "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion . . . and [as long as those assumptions] accurately reflect the limitations and capabilities of the claimant involved." *McIntyre v. Colvin*, 758 F.3d 146, 151-52 (2d Cir. 2014) (internal quotation marks and citations omitted) (holding that any error in the ALJ's hypothetical question posed to the VE was harmless where the hypothetical "closely tracked the ALJ's residual functional capacity assessment" and "sufficiently accounted for the combined effect of [the plaintiff's] impairments"); *Wavercak v. Astrue*, 420 Fed. Appx. 91, 95 (2d Cir. 2011) (rejecting a challenge to the VE's testimony after concluding that substantial record evidence supported the RFC finding).

Specifically, Mr. Sena argues that the ALJ erred in asking the VE to assume that he could sit for periods of time,[11] in light of the record evidence that Mr. Sena experienced pain when doing so and needed to stand and walk to relieve pain. (*See, e.g.*, R. 920, 1254.) But, as discussed above,

---

[10] "Specific Vocational Preparation," or "SVP," is the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dictionary of Occupational Titles*, App. C - Components of the Definition Trailer (4th ed.), 1991 WL 688702. An SVP of 2 refers to "anything beyond short demonstration up to and including 1 month." *Id.*

[11] The regulations provide that "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

the ALJ's determination of Mr. Sena's RFC was consistent with the record. In particular, it reflected the State agency medical consultant's opinion that Mr. Sena could sit for about six hours in an eight-hour workday and otherwise assumed greater restrictions than those proposed by the State medical consultant. (*See* R. 124.) I therefore find no error in the hypothetical question posed to the VE.

Mr. Sena also challenges the VE's testimony about jobs available in the national economy. Mr. Sena argues that 10,000 jobs in the national economy is not a "significant number of jobs." He also argues that the VE did not provide a basis for her testimony that the occupation of "document preparer" existed in significant numbers in the current national economy.

The Second Circuit has held that, in reviewing the testimony of a VE, courts should apply a "typical 'substantial evidence'" analysis by "reviewing the entirety of a VE's testimony, including the expert's methods, to make sure it [rises] to the level of 'substantial' evidence." *Brault v. Comm'r of Soc. Sec.*, 683 F.3d 443, 450 (2d Cir. 2012). A VE must generally identify the sources for her conclusions. When he or she does so, the VE "is not required to identify with specificity the figures or sources supporting his [or her] conclusion." *McIntyre*, 758 F.3d at 152 (holding that the VE "was not required to articulate a more specific basis for his opinion," which was "given on the basis of the expert's professional experience and clinical judgment, and which was not undermined by any evidence in the record").

To assess an ALJ's conclusion that "significant numbers" of available jobs exist in the national economy, courts are "generally guided by numbers that have been found 'significant' in other cases." *Hamilton*, 105 F. Supp. at 230. *See also Koutrakos v. Colvin*, No. 3:13-CV-1290 (JGM), 2015 WL 1190100, at *20-22 (D. Conn. Mar. 16, 2015) (discussing whether "significant numbers" of relevant jobs existed). In *Koutrakos*, though the Court questioned whether 85 jobs in

the state of Connecticut was a "sufficient number," the Court affirmed the ALJ's conclusion that there were significant numbers of jobs that the plaintiff could perform where the VE testified that there were 1,296 other relevant jobs in the state and 152,000 relevant jobs nationally. *Id*. at *22. By contrast, the court in *Hamilton* found that three occupations with a total of 13 positions regionally and 5,160 positions nationally were not significant numbers. *Hamilton*, 105 F. Supp. 3d at 231.

Though Mr. Sena challenges the significance of 10,000 touch-up screener positions nationally, none of the cases he cites supports this challenge, and the case law in general appears to refute it. *See, e.g.*, *Hanson v. Comm'r of Soc. Sec.*, No. 3:15-CV-0150 (GTS/WBC), 2016 WL 3960486, at *13 (N.D.N.Y. June 29, 2016) (report and recommendation) (although "[n]either the Regulations nor the Social Security Rulings define 'significant number' . . . . [c]ourts have held that a 'significant number' of jobs is 'fairly minimal,'" and that "numbers varying from 9,000 upwards constituted 'significant'") (citing cases). In any event, the VE testified that there was a total of 55,000 jobs nationally between the two occupations provided—a number that easily qualifies. *See, e.g.*, *Roe v. Colvin*, No. 1:13-CV-1065 (GLS), 2015 WL 729684, at *7 (N.D.N.Y. Feb. 19, 2015) (finding 44,000 jobs in the national economy and 630 jobs in the local economy to be significant); *Gray v. Colvin*, No. 12-CV-6485L, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (finding 16,000 jobs nationally and 60 jobs regionally to be significant "given the low threshold evidently required, and the Social Security Act's emphasis on providing benefits only to claimants who cannot engage in *any* other kind of substantial gainful work which exists in the national economy") (internal quotation marks omitted).

Mr. Sena also challenges the VE's testimony that there are 45,000 document preparer jobs in the current national economy, arguing that such an occupation no longer exists, as it has become

obsolete. The VE testified at the hearing that the document preparer job was sedentary with an SVP of 2 and that there were 45,000 such jobs nationally, but that the currently available document preparer job differs from the description of that job in the DOT, which was last updated in 1986 and which included references to "paper cutters" and "microfilm." (R. 89.) The VE testified, "I have found [the job] to be performed differently in the current labor market." (*Id.*)

"Evidence from VEs . . . can include information not listed in the DOT . . . . Information about a particular job's requirements . . . may be available . . . from a VE's . . . experience in job placement or career counseling." SSR 00-4P, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000). Here, the claimant's counsel at the hearing, after reviewing the VE's resume (R. 314), stated that she had no objection to the VE's qualifications. (R. 85.) Therefore, the VE's statement about her experience was a proper basis for her conclusions about the current version of the document preparer position.

Before relying on VE evidence, ALJs must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles (DOT) . . . and [e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4P, 2000 WL 1898704. Here, the ALJ identified a conflict between the VE's testimony and the DOT's description of the document preparer position. The ALJ then properly explained his finding that the VE provided a "reasonable explanation" for her opinion that the document preparer job maintained an SVP of 2 and was still performed at the sedentary exertional level. (R. 37.)

Accepting Mr. Sena's argument would entail substituting the Court's views about the status of the current national economy for the expertise of the ALJ and the VE, which I decline to do,

mindful that courts generally reject attempts by claimants to inject evidence about particular industries or occupations. *See Bavaro v. Astrue*, 413 Fed. Appx. 382, 384 (2d Cir. 2011) ("declin[ing] [plaintiff's] invitation to take judicial notice of the decline of the photofinishing industry"); *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 408 (D. Conn. 2012) ("The Court may not substitute its own judgment for that of the ALJ in assessing the VE's identification of the three jobs as consistent with the hypothetical."), *aff'd*, 515 Fed. Appx. 32 (2d Cir. 2013).

## CONCLUSION

For the reasons discussed above, Mr. Sena's motion to reverse or remand the Commissioner's decision (ECF No. 22) is DENIED. The Commissioner's motion to affirm that decision (ECF No. 26) is GRANTED.


IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:       Hartford, Connecticut
             August 14, 2018